# REDACTED OPINION

# In the United States Court of Federal Claims

### No. 16-126C
### Filed: April 7, 2016
### Redacted Version Issued for Publication: April 26, 2016[1]

| | |
|---|---|
| * * * * * * * * * * * * * * | * |
| * | * |
| **UNIVERSAL PROTECTION** | * |
| **SERVICE, LP,** | * |
| | * |
| **Protestor,** | * |
| **v.** | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| **Defendant,** | * |
| | * |
| **v.** | * |
| | * |
| **COMMAND SECURITY CORP.,** | * |
| | * |
| **Defendant-Intervenor.** | * |
| | * |
| * * * * * * * * * * * * * * | * |

Post-Award Bid Protest; Motion to Dismiss; Standing; Successor-in-Interest.

 

**Kevin P. Mullen**, Jenner & Block LLP, Washington, D.C., for protestor. With him was **Ethan E. Marsh, Charles L. Capito**, and **R. Locke Bell**, Jenner & Block LLP, Washington, D.C.

**Matthew P. Roche**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, Department of Justice. Of counsel were **Michelle Windmueller** and **Richard Y. Rho**, Attorneys, United States Postal Service.

**Scott A. Schipma,** Winston & Strawn, LLP, Washington, D.C., for defendant-intervenor. With him was **Bryant E. Gardner**, Winston & Strawn, LLP, Washington, D.C.

---

[1] This opinion was issued under seal on April 7, 2016. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]." The name of the license which the parties' requested be redacted is reflected as: "[ABM Security Services' license]."

**O P I N I O N**

**HORN, J.**

      The protestor, Universal Protection Service, LP (Universal), filed a bid protest in this court on January 27, 2016, challenging the United States Postal Service's (USPS) award of a contract to Command Security Corporation (CSC or Command)[2] under Solicitation No. 2B-14-A-0078 (the Solicitation). Protestor raises six counts in this court arguing that the evaluations of protestor's and intervenor CSC's proposals were flawed, the best value decision was arbitrary and capricious, and that the agency "conducted unequal and inadequate discussions with ABM [ABM Security Services, Inc.]."[3] Therefore, protestor seeks temporary relief from the court restraining "USPS from transitioning the NLECC [National Law Enforcement Communications Centers] and Security Guard services contract to CSC pending the Court's resolution of this bid protest," and to "[p]ermanently enjoin USPS and CSC from performing the NLECC and Security Guard services contract until USPS reopens the procurement process, solicits revised proposals, evaluates the revised proposals, and makes a new award decision consistent with the Solicitation." Protestor also seeks an order declaring the contract award to CSC to be "arbitrary and capricious, an abuse of discretion, and a violation of procurement law and policy."

**FINDINGS OF FACT**

      On July 25, 2014, the USPS issued a purchase plan, establishing an intent to obtain a contractor or contractors for two services: (1) staffing and operating the National Law Enforcement Communications Centers (NLECC) in Dulles, VA and Fort Worth, TX; and (2) Security Guard Services at approximately 57 locations across the United States and its territories.[4] Securitas Critical Infrastructure Services, Inc. (Securitas) was the

---

[2] CSC filed a motion to intervene in the above captioned protest on January 27, 2016, which was granted on January 29, 2016.

[3] As discussed at length below, on October 26, 2015, there was a sale of the assets of ABM Security Services, Inc. (ABM Security Services) from ABM Industries, Inc. (ABM Industries), ABM's parent company, to protestor Universal. Protestor alleges in its complaint that Universal acquired all of the assets of ABM Security Services, including ABM Security Services' September 30, 2014 offer to the Solicitation.

[4] The joint stipulation of facts state:

    The NLECC operates 24 hours a day, 365 days a year. The centers log and record events, such as: "emergency dispatch, incident report writing and analysis." "NLECCs provide centrally managed law enforcement radio traffic for approximately 2,500 radios, alarm monitoring for approximately 11,000 intrusion detection systems, and remote alarm panel programming." The centers "provide after-hours emergency phone coverage for all Inspection Service divisions, receive notification

2

incumbent for the NLECC contract, and ABM Security Services was the incumbent for the Security Guard Services contract. The purchase plan noted that although USPS had contracted for these services separately in the past, the purchase plan sought to consolidate the services into one solicitation "in order to consider consolidating the supply base by using one supplier to potentially provide both services." The purchase plan noted that "[t]he USPS may award one or multiple contracts based on the results of the competitive solicitation."  The purchase plan provided a four-year base term, with three, two-year options for both the NLECC and Security Guards Services, and the purchase plan stated that the solicitation would require the award decision to be based upon the best value to the USPS.

On August 28, 2014, USPS issued Solicitation No. 2B-14-A-0078 (the Solicitation). The Solicitation contained two line items.  Line item no. 00001 was for NLECC Services and required the awardee to:

> Provide dispatch and alarm monitoring services in support of the U.S. Postal Inspection Service (USPIS) at each NLECC according to the attached NLECC Statement of Work (SOW). The two (2) locations are Dulles VA, and Ft. Worth TX. This includes direct support of each NLECC by monitoring multiple types of alarm systems, closed-circuit television, dispatch communications and access to national law enforcement databases.

Line item no. 00002 was for Security Guard Services and required the awardee to: "Provide Guard I and II, and security mail screeners, as needed in support of the security program according to the attached Security Services Statement of Work. In addition potentially provide canine handlers with trained working dogs according to the attached Security Services Statement of Work."

The evaluation factors were the same for both the NLECC and the Security Guard Services, and the four technical evaluation factors, in descending order of importance, were: (1) Technical Approach; (2) Management and Staffing Plan; (3) Supplier Capability; and (4) Past Performance.  The Solicitation explained that the technical factors were more important than price, but noted that the "Postal Service will not pay significantly more for marginal increases in technical value or merit, and the perceived benefits of a higher priced proposal must warrant the additional cost." The Solicitation also indicated that USPS would make the award decisions based upon best value, which it defined as "the outcome that provides the optimal combination of elements, such as lowest total cost of ownership, technology, innovation and efficiency, assurance of supply, and quality relative to the Postal Services' needs."

--------

concerning biological detection system (BDS) alarms from postal processing and distribution centers, and access law enforcement and intelligence information databases."

(internal citations omitted).

In addition, the Solicitation had a section titled "Contract Clauses." Clause 4-1 stated, in part:

> b. Assignment. If this contract provides for payments aggregating $10,000 or more, claims for monies due or to become due from the Postal Service under it may be assigned to a bank, trust company, or other financing institution, including any federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any assignment or reassignment must cover all amounts payable and must not be made to more than one party, except that assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in financing this contract. No assignment or reassignment will be recognized as valid and binding upon the Postal Service unless a written notice of the assignment or reassignment, together with a true copy of the instrument of assignment, is filed with:
>
> (1) The contracting officer;
>
> (2) The surety or sureties upon any bond; and
>
> (3) The office, if any, designated to make payment, and the contracting officer has acknowledged the assignment in writing.
>
> (4) Assignment of this contract or any interest in this contract other than in accordance with the provisions of this clause will be grounds for termination of the contract for default at the option of the Postal Service.

Clause 4-1b.

USPS received six timely proposals in September 2014, in response to the Solicitation. Four offerors submitted proposals for both the NLECC and Security Guards Services: ABM Security Services, CSC, G4S Secure Solutions (USA) Inc. (G4S), and Securitas. In addition, Gonzales Consulting Services, Inc. (Gonzales) submitted only a NLECC proposal, and U.S. Security Associates, Inc. (U.S. Security) submitted only a Security Guards proposal. The Supply Management Competitive Award Recommendation (Award Recommendation) reflected that the Technical Evaluation Team reviewed the proposals, and evaluated them for strengths, weaknesses, deficiencies, and risks in relation to the evaluation factors, as well as conducted oral presentations with the six offerors in October 2014. The parties have stipulated that, "[a]ccording to the Award Recommendation, the TET [Technical Evaluation Team] then reached a consensus on the ratings for each proposal in relation to the respective evaluation schemes, establishing rankings for the offerors, and summarizing the results in an evaluation spreadsheet."

The Technical Evaluation Team indicated that for ABM Security Services, "[t]he NLECC proposal did not clearly demonstrate an understanding of the requirements in the

Statement of Work. ABM presents a program that is more security guard based as is evident in the suggested program for the NLECC centers, which is essentially a guard conversion program," and rated ABM Security Services' NLECC technical proposal as "Fair." For CSC, the Technical Evaluation Team indicated that "Command Security offered a sound program for the NLECC that will meet the Statement of Work requirements, indicating a high probability of successful performance in supporting USPIS," and rated CSC's NLECC technical proposal as "Good." The technical evaluation for the offerors' NLECC proposals were summarized in the Award Recommendation:

| NLECC | Technical Approach | Mgmt. & Staffing Plan | Supplier Capability | Past Performance | Overall Technical Rating | Overall Technical Ranking |
|---|---|---|---|---|---|---|
| Securitas | GOOD | GOOD | GOOD | GOOD | GOOD | 1 |
| Command | GOOD | GOOD | GOOD | GOOD | GOOD | 2 |
| ABM | GOOD | POOR | FAIR | GOOD | FAIR | 3 |
| Gonzales | FAIR | FAIR | FAIR | GOOD | FAIR | 4 |
| G4S | FAIR | FAIR | GOOD | GOOD | FAIR | 5 |

The Technical Evaluation Team stated that in its Security Guards Services technical proposal, ABM Security Services "offered some new programs and technological advances that could make the program more robust than it is today. ABM also suggested an innovative revenue idea for charging electric vehicles on USPS sites. ABM is capable of running the unarmed guard program on a national level and providing resources."[5] The Technical Evaluation Team rated ABM Security Services' Security Guards Services technical proposal as "Good," ranking it as first amongst the offerors. The Technical Evaluation Team also rated CSC's Security Guards Services technical proposal as "Good" and indicated that "Command's proposal for Guards offered some experience and capability that other suppliers did not demonstrate." The technical evaluation for all the offerors for the Security Guards Services proposal were summarized in the Award Recommendation:

| Guards | Technical Approach | Mgmt. & Staffing Plan | Supplier Capability | Past Performance | Overall Technical Rating | Overall Technical Ranking |
|---|---|---|---|---|---|---|
| ABM | GOOD | GOOD | GOOD | GOOD | GOOD | 1 |
| Command | GOOD | GOOD | GOOD | GOOD | GOOD | 2 |
| Securitas | GOOD | POOR | GOOD | GOOD | FAIR | 3 |
| G4S | FAIR | FAIR | GOOD | GOOD | FAIR | 4 |
| U.S. Security | FAIR | GOOD | FAIR | GOOD | FAIR | 5 |

---

[5] The agency in its evaluation documents, as well as the parties in their submissions to the court, typically refer to ABM Security Services as "ABM." Unless otherwise indicated, the court has left unchanged any quotations which refer to ABM Security Services as ABM.

After discussions,[6] the offerors submitted revised prices, and according to the Award Recommendation, the final price evaluations were:

| Price Ranking NLECC | Supplier | Base Period + Transition | Base 4 years + 3, 2-year Options + Transition |
|---|---|---|---|
| 1 | Gonzales | $[redacted] | $[redacted] |
| 2 | ABM | $[redacted] | $[redacted] |
| 3 | Securitas | $[redacted] | $[redacted] |
| 4 | Command Security | $15,819,419 | $40,026,301 |
| 5 | G4S | $[redacted] | $[redacted] |

The Award Recommendation concluded the NLECC analysis as follows:

> From a multiple award perspective, Securitas' proposal is most advantageous and USPS would obtain best value from awarding the NLECC contract to this offeror. However, since Securitas' proposal along with the proposals submitted by ABM and Command were rated highest technically and all were judged price competitive for both NLECC and Guards, it was necessary for the Purchase/SCM Team to first conduct the trade-off analysis for the Guards proposals followed by a single award trade-off analysis for both service components before reaching a final best value determination.

| Price Ranking GUARDS | Supplier | Base Period + Transition | Base 4 years + 3, 2-year Options + Transition |
|---|---|---|---|
| 1 | Command Security | $84,408,289 | $209,990,394 |
| 2 | ABM | $[redacted] | $[redacted] |
| 3 | Securitas | $[redacted] | $[redacted] |
| 4 | U.S. Security | $[redacted] | $[redacted] |
| 5 | G4S | $[redacted] | $[redacted] |

The Award Recommendation concluded the Security Guards Services trade-off analysis, as follows:

---

[6] As noted in joint stipulation of facts, the agency made the decision only to hold discussions with the offerors who "submitted the highest technically rated (no less than Good) proposals for each service (NLECC and Guards)." Therefore, USPS held discussions for the NLECC proposals with Securitas and CSC, as both of their proposals were rated as "Good," and did not hold discussions with ABM Security Services, Gonzales, or G4S, as their NLECC proposals were all rated "Fair."

> From a multiple award perspective, Command's proposal is most advantageous and USPS would obtain best value from awarding the Guards contract to this offeror. At this point in the source selection process the Purchase/SCM Team needed to determine if best overall value would be obtained from awarding two separate contracts, one to Securitas for NLECC and one to Command for Guards, or from awarding a single contract to one of the three highest rated technical proposals offering competitive prices for both service components.

The agency then performed a NLECC and Security Guards Services combined[7] trade-off analysis, in which the agency considered the technical and price evaluations from the both the NLECC and Security Guards Services proposals. The Award Recommendation explained the combined trade-off analysis as follows:

> As previously stated, the USPIS [United States Postal Inspection Service] has determined that there are significant advantages to the USPS if a single supplier provides both service components. Communications will be enhanced with one supplier, especially during emergent events. The USPIS relies on the NLECC for communications and radio traffic. A single supplier would be in a better position to enhance overall resource allocation across the security network for both USPIS as well as supplier assets. The USPIS requires information at all times during emergent and routine security incidents. It has multiple departments that are involved with the guards and the NLECC operations. A single supplier would eliminate historically identified communication barriers and facilitate the ability to for USPIS to achieve operational and administrative efficiencies while strengthening the effectiveness of the enterprise security program.

The Award Recommendation summarized the combined trade-off analysis as follows:

> Although both Securitas and Command were adjectively rated Good for the NLECC and Guards, Command's combined proposals are judged technically superior to the combined offerings of either ABM or Securitas. Ranked technically first and third respectively for NLECC and Guards, ABM's combined service component total evaluated price is $[redacted] Ranked technically third and first respectively for NLECC and Guards, Securitas' combined total evaluated price is $[redacted]. Ranked technically second for both components, Command's combined total evaluated price is $250,016,695, which is [redacted] lower than ABM's and [redacted] lower than Securitas' evaluated prices over the anticipated 10-year life of the contract.
>
> . . .

---

[7] As noted above, the purchase plan provided that "[t]he USPS may award one or multiple contracts based on the results of the competitive solicitation."

Any further trade-off analysis between ABM's combined proposal and Command's combined proposal is simplified by the fact that the Purchase/SCM Team judged Command's proposal to be more advantageous both from a technical and price perspective. As previously stated in the Guards trade-off analysis, the Purchase/SCM Team was unable to identify any clear technical differentiation between ABM's proposal and Command's proposal sufficient to offset Command's total evaluated price advantage of $[redacted]. Moreover, Command's NLECC proposal was rated technically superior to ABM's NLECC proposal. With a combined total evaluated price advantage of [redacted] over ABM, Command's NLECC and Guards proposals taken as a whole represents a better life cycle value to USPS.

On January 2, 2015, USPS notified ABM Security Services that CSC had been selected for contract award under the Solicitation. Four days later, on January 6, 2015, USPS provided ABM Security Services an oral debriefing regarding the award decision. Three days after that, on January 9, 2015, ABM Security Services filed a business disagreement with the contracting officer, which the contracting officer subsequently denied on January 20, 2015. On January 22, 2015, ABM Security Services filed an appeal with USPS Supplier Disagreement Resolution Official, and requested that, if the Official did not issue a decision by February 1, 2015, that he stay the transition to CSC. The Official, however, denied ABM Security Services' stay request on January 28, 2015. The same day, ABM Security Services filed a post-award bid protest in the United States Court of Federal Claims, Case No. 15-87C, and requested a temporary restraining order and preliminary injunction to prohibit the transition to CSC, pending the appeal process. The court held an initial status conference on January 29, 2015. The same day, January 29, 2015, the USPS Supplier Disagreement Resolution Official reconsidered his decision and agreed to postpone the transition of the contracts to CSC pending the appeal process. The defendant filed a notice of corrective action in the United States Court of Federal Claims on January 30, 2015, at which time ABM Security Services filed a motion for voluntary dismissal of Case No. 15-87C, which the court granted on January 30, 2015.

On June 15, 2015, the USPS Supplier Disagreement Resolution Official denied ABM Security Services' appeal on the merits, which challenged USPS' technical and price evaluations. Although the Official affirmed USPS' best value determination, he noted that he had identified computational errors in the contracting officer's price analysis, which indicated that CSC's price advantage was $[redacted], rather than the approximately $[redacted] advantage identified in the Award Recommendation. Despite the errors, the Official determined that the computational errors were not prejudicial, and stated that he had notified the "CO [contracting officer] and his management" of the mistake and, "they concluded that even with the smaller price advantage, the best value decision remains the same." On June 29, 2015, ABM Security Services again filed a post-award bid protest in the United States Court of Federal Claims, Case No. 15-648C, in which ABM Security Services argued that the evaluations of ABM Security Services' and CSC's proposals were flawed, the best value decision was arbitrary and capricious, and that the agency

had conducted inadequate discussions with ABM Security Services. After an initial status conference, and a subsequent hearing which established a briefing schedule, the defendant again filed a notice of corrective action on July 9, 2015, and indicated that agency intended to:

> [U]ndertake corrective action in ABM Security Services, Inc.'s (ABM) protest of USPS's award of a contract for staffing and operating two National Law Enforcement Communications Centers (NLECC) and Security Guard Services at approximately 57 locations. Following the USPS Supplier Disagreement Resolution Official's identification of a price calculation error, and counsel's subsequent review of the record, corrective action is warranted to permit the contracting officer to determine the correct price differential between the offerors and conduct a revised best value determination. The contracting officer will have the discretion to address any other issues raised by the parties or otherwise identified in the record.

(internal citations omitted). Once again, in light of defendant's representation, on July 9, 2015, the court dismissed the second protest, Case No.  15-648C, filed by ABM Security Services, without prejudice.

On October 26, 2015, protestor Universal concluded an acquisition of ABM Security Services. Two days later, on October 28, 2015, ABM Security Services notified the contracting officer, and specifically requested that the agency execute a novation agreement concerning ABM Security Services' two existing contracts with USPS.[8] The following day, ABM Security Services sent the contracting officer another letter, signed by Oded Barlev, ABM Security Services' Vice President of National Operations, which stated: "With regard to ABM's September 30, 2014 offer, we hereby confirm that the offer, along with all of ABM's assets, has been legally transferred to Universal. The offer, now owned by Universal, continues to rely on the same assets – including facilities, resources, and personnel – as originally proposed by ABM."

On November 20, 2015, the contracting officer informed ABM Security Services[9] of the results of the most recent corrective action and indicated that the "ultimate outcome of the best value analysis remained the same." Therefore, the contracting officer concluded that the "award of the contract to CSC will not be disturbed." The contracting officer informed ABM Security Services that the corrective action was intended "to review

---

[8] Subsequently, on November 30, 2015, the contracting officer responded to ABM Security Services' request to novate its existing USPS contracts, and requested certain documentation. ABM Security Services responded that it would compile the requested documentation to novate its existing contracts. As of March 21, 2016, the agency had not yet acted on the request to novate the contracts.

[9] Although the sale of ABM Security Services to Universal had been completed on October 26, 2015, in a response to a letter from protestor's counsel of record, the agency addressed its response to "ABM Security Services."

all of the underlying numbers that constituted the calculated evaluated prices and to correct any errors that were found in the numbers. Every pricing sheet was scrutinized." The contracting officer further stated that he had "updated my Award Recommendation to reflect corrections in the numbers" and "re-visited my best value analysis in the light of the corrected numbers." Specifically, the contracting officer indicated that "the purchase team undertook a thorough review of the pricing evaluation sheets prepared prior to the original award recommendation and found that errors had been made," but determined that "none of these errors were significant enough to undermine the validity of the original best value determination."

The agency included the following chart in the updated Award Recommendation which provided both the original and the revised evaluated prices of the offerors:

**Final Price Rankings Including Options**

**Original**

| Price Ranking NLECC | Supplier | Base Period + Transition | Base 4 years + 3, 2-year Options + Transition |
|---|---|---|---|
| 1 | Gonzales | $[redacted] | $[redacted] |
| 2 | ABM | $[redacted] | $[redacted] |
| 3 | Securitas | $[redacted] | $[redacted] |
| 4 | Command Security | $15,819,419 | $40,026,301 |
| 5 | G4S | $[redacted] | $[redacted] |

| Price Ranking GUARDS | Supplier | Base Period + Transition | Base 4 years + 3, 2-year Options + Transition |
|---|---|---|---|
| 1 | Command Security | $84,408,289 | $209,990,394 |
| 2 | ABM | $[redacted] | $[redacted] |
| 3 | Securitas | $[redacted] | $[redacted] |
| 4 | U.S. Security | $[redacted] | $[redacted] |
| 5 | G4S | $[redacted] | $[redacted] |

**Updated[10]**

---

[10] "TCO" refers to total cost of ownership.

| Price Ranking NLECC | Supplier | Base Period + Transition | Base 4 years + 3, 2-year Options + Transition |
|---|---|---|---|
| 1 | Gonzales | $[redacted] | $[redacted] |
| 2 | Command Security | $15,819,419 | $39,196,997 |
| 3 | ABM | $[redacted] | $[redacted] |
| 4 | Securitas | $[redacted] | $[redacted] |
| 5 | G4S | $[redacted] | $[redacted] |

| Price Ranking GUARDS | Supplier | Base Period + Transition | Base 4 years + 3, 2-year Options + Transition |
|---|---|---|---|
| 1 | Command Security | $83,325,039 | $209,440,472 |
| 2 | ABM | $[redacted] | $[redacted] |
| 3 | Securitas | $[redacted] | $[redacted] |
| 4 | U.S. Security | $[redacted] | $[redacted] |
| 5 | G4S | $[redacted] | $[redacted] |

With regard to the NLECC and Guards combined trade-off analysis, the Award Recommendation was updated with the corrected numbers to state:

Command's combined proposal is judged superior to the combined offerings of either ABM or Securitas. Ranked technically third and first for NLECC and Guards, respectively, ABM's updated combined total evaluated price is $[redacted]. Ranked technically first and third for NLECC and Guards, respectively, Securitas' updated combined total evaluated price is $[redacted]. Ranked technically second for both components, Command's updated combined total evaluated price is $248,637,469, which is [redacted] lower than ABM's and [redacted] lower than Securitas' updated evaluated prices over the anticipated 10-year life of the contract.

As indicated in the joint stipulation of facts, "[t]he summary of results of the NLECC and Guards trade-off analysis for each of the three highest rated and most price competitive proposals was updated to reflect the corrected numbers." The updated Award Recommendation indicated as follows:

| Suppliers | NLECC Technical Ranking | Guards Technical Ranking | NLECC Price Ranking | Guards Price Ranking | Combined Overall Ranking | Combined Overall Price Base 4 years + 3, 2-year Options + Transition |
|---|---|---|---|---|---|---|
| Command | 2 | 2 | 2 | 1 | 1 | $248,637,469 |
| ABM | 3 | 1 | 3 | 2 | 2 | $[redacted] |
| Securitas | 1 | 3 | 4 | 4 | 3 | $[redacted] |

Therefore, the contracting officer noted that the updated Award Recommendation determined that "a combined award to Command offers the Postal Service the optimal best value scenario for this particular purchase."

On November 30, 2015, protestor submitted another business disagreement to the contracting officer challenging, what protestor defined as, the "re-award" of the contract to CSC. On December 10, 2015, the contracting officer responded to protestor stating that "there was no 're-award.'" The contracting officer informed protestor that he believed protestor was not an interested party to protest, stating that:

[I]t does not appear that Universal was an actual or prospective offeror with respect to the solicitation . . . . I am not aware of any binding regulation or authority that would allow a purchaser to step into the shoes of an actual offeror, long after a solicitation has closed, without the express consent and approval of the Postal Service.

In response, on December 14, 2015, protestor submitted a business disagreement with the USPS Supplier Disagreement Resolution Official, challenging the results of the corrective action and the contracting officer's response to Universal's November 30, 2015 letter. The USPS Supplier Disagreement Resolution Official responded to the protestor on January 13, 2016, and agreed with the contracting officer that "no new business disagreement exists and no further Supplier Disagreement Resolution Official review is required." The Official also indicated to the protestor and that the decision to take corrective action "did not result in the termination of the January 2015 award to CSC nor did it result in any award, but rather a reevaluation that affirmed the original best value determination and left the existing award in place." After the USPS Supplier Disagreement Resolution Official's response, protestor filed the current, above captioned bid protest, Case No. 16-126C, in this court on January 27, 2016.  After an initial hearing with the parties, the court set a schedule and the parties briefed the defendant's and intervenor's motions to dismiss for lack of subject matter jurisdiction, as well as the parties' cross-motions for judgment on the Administrative Record. On March 21, 2016, the court held oral argument.

**DISCUSSION**

As a threshold matter, the court addresses defendant and defendant-intervenor's

allegations that this court does not have subject matter jurisdiction to decide protestor's bid protest in the above-captioned case because protestor does not have standing and is not an "interested party." Defendant claims that the protestor, Universal, did not submit a bid in response to the solicitation and, therefore, cannot be an "actual bidder." By contrast, protestor states that:

> Universal is an interested party with standing to file this action, because (i) it is the complete successor-in-interest to ABM, the entity that submitted a proposal in response to the USPS Solicitation at issue here; and (ii) ABM would have had a substantial chance of receiving the new USPS contract but for the procurement errors made by USPS.

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Hymas v. United States, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (explaining that a federal court must satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in

part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

This court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) (2012) of the Tucker Act, which provides that this court has:

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). The Administrative Dispute Resolution Act of 1996 (ADRA), codified at 28 U.S.C. § 1491(b)(1)–(4) (2012), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001).

In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract.'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009))); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1317 (Fed. Cir. 2007); see also Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits . . . ."); see also Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp.

of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

Defendant argues, and intervenor agrees, that "Universal does not possess standing because the solicitation specifically precluded ABM's post-award, unilateral assignment of its offer to Universal." As noted above, the Solicitation contained a series of contract clauses, including Clause 4-1, which stated, in part:

> b. Assignment. If this contract provides for payments aggregating $10,000 or more, claims for monies due or to become due from the Postal Service under it may be assigned to a bank, trust company, or other financing institution, including any federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any assignment or reassignment must cover all amounts payable and must not be made to more than one party, except that assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in financing this contract. No assignment or reassignment will be recognized as valid and binding upon the Postal Service unless a written notice of the assignment or reassignment, together with a true copy of the instrument of assignment, is filed with:
>
> (1) The contracting officer;
>
> (2) The surety or sureties upon any bond; and
>
> (3) The office, if any, designated to make payment, and the contracting officer has acknowledged the assignment in writing.
>
> (4) Assignment of this contract or any interest in this contract other than in accordance with the provisions of this clause will be grounds for termination of the contract for default at the option of the Postal Service.

Clause 4-1b. Intervenor argues that "Clause 4-1 specifically provides that the assignment of "any interest in this contract" not in accordance with the clause 'will be grounds for termination of the contract for default at the option of the Postal Service.'" (footnote omitted). Intervenor argues, therefore, that the "plain meaning of the language in Clause 4-1 supports the view that the phrase 'any interest in this contract' includes ABM's rights and interests in the proposal it submitted in an attempt to secure the award of 'this contract.'" By contrast, protestor claims that "[t]he clause itself plainly indicates that it only applies to contracts."

When the terms of a solicitation are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. See CBY Design Builders v. United States, 105 Fed. Cl. at 327 (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d

1345, 1353 (Fed. Cir. 2004)); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 131 S. Ct. 997 (2011); Teg–Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." (quoting Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."). "A solicitation term is ambiguous if 'more than one meaning is reasonably consistent with [its] language.'" Furniture by Thurston v. United States, 103 Fed. Cl. 505 511 (2012) (quoting Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996)) (modification in original). The United States Court of Appeals for the Federal Circuit has stated that, "[t]o show an ambiguity [in contract language,] it is not enough that the parties differ in their respective interpretations of a contract term." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). In order to demonstrate ambiguity, the interpretations offered by both parties must "'fall within a "zone of reasonableness."'" Id. (quoting Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999) (citations omitted)); see also Ace Constructors, Inc. v. United States, 499 F.3d 1357, 1361 (Fed. Cir. 2007) ("[I]n interpreting a solicitation, '[it] is ambiguous only if its language is susceptible to more than one reasonable interpretation. . . . If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning.'" (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353)).

The court agrees with the protestor that the plain meaning of the contract clause in the Solicitation is clear.[11]  Protestor indicates that the

> clause concludes that "[a]ssignment of **this contract** or any interest **in this contract** other than in accordance with the provisions of this clause [Clause 4.1b] will be grounds for termination of **the contract** for default at the option of the Postal Service." Further confirming that it applies only to contracts, the same clause authorizes the contracting officer to "order changes within the general scope of this contract," "to terminate this contract, or any part hereof, for its sole convenience," and "to may terminate this contract, or any part hereof, for default by the supplier . . . ."  None of these provisions makes sense if the term "contract" is interpreted to include a proposal.

(emphasis in original; internal citations omitted). The court also agrees with the protestor that the contract clause in the Solicitation is directed at a time when the contract awardee

---

[11] Although the court believes the clause is clear, if the contract clause was in fact ambiguous, the ambiguity would be a latent one, and "[u]nder the rule of *contra proferentem,* a latent ambiguity is resolved against the government as drafter of the solicitation." Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 708-709  (citing E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1342 (Fed. Cir. 2004)) (footnote omitted).

attempts to assign a contract that had been awarded to a contractor, and does not address the scenario in which an offeror tries to assign a proposal. The rules applicable regarding an awardee's assignment of a contract are different than the rules applicable to assignment of a proposal submitted in response to a solicitation by an ultimately unsuccessful bidder. The court concludes that Contract Clause 4.1b could apply to a contract dispute between the agency and an awardee, but does not does resolve issues regarding an entity which has only submitted a proposal, and does not address a situation in a post-award bid protest brought by a disappointed bidder.  Notably in this protest, protestor was not awarded the contract, and, therefore, the assignment would not be relevant under this clause. As indicated in the clause, one of the remedies available to the USPS is termination for default if the contract does not follow the provisions of the contract clause.  That clause, however, is not applicable to protestor who did not get awarded the contract.  Therefore, Contract Clause 4.1b does not preclude Universal from bringing the protest in this court.

Defendant also argues that "Universal does not meet even the most basic requirement to establish jurisdiction because Universal did not submit a proposal in this procurement. Rather, it was ABM Security Services, Inc. - not Universal Protection Services [sic] LP - that submitted the proposal."  Moreover, intervenor argues that "the sale to Universal did not include all the assets committed to the performance of the contract by ABM's proposal and, as a result, Universal lacks a direct economic interest because ABM's proposal has no substantial chance of receiving an award." Protestor responds that:

> Defendant's and Intervenor's claims that Universal is not the complete successor-in-interest to ABM also are misplaced. The legal entity that submitted the proposal was ABM, not its parent or its affiliates. The proposal does not include any parent or affiliate guarantee or otherwise commit the resources of the parent or affiliates to performance of the contract.

(internal citations omitted).

The Federal Circuit has articulated the logical conclusion that in order to be an actual or prospective bidder, a protestor must have submitted a bid.[12] See Rex Serv., Corp. v. United States, 448 F.3d at 1307.  As explained by the Rex court,

> MCI [MCI Telecommunications Corp. v. United States, 878 F.2d 362 (Fed. Cir. 1989)] held that "in order to be eligible to protest, one who has not actually submitted an offer must be *expecting* to submit an offer prior to the closing date of the solicitation."  Further, "the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends."

---

[12] At oral argument, the parties agreed that the court should look to the protestor's status as an actual or a prospective bidder at the time the protest was filed to determine if a protestor has standing to bring a protest.

Here, because Rex could have bid, but chose not to, it cannot be considered a prospective bidder.

See Rex Serv., Corp. v. United States, 448 F.3d at 1307 (quoting MCI Telecommunications Corp. v. United States, 878 F.2d at 365) (emphasis in original).  It is equally clear, however, that even if a bidder did not submit a proposal, if it is the complete successor-in-interest to the actual offeror, the bidder may stand in the shoes and have standing to bring a protest. See L-3 Commc'ns Integrated Sys., L.P. v. United States, 84 Fed. Cl. 768, 778-79 (2008) ("L–3 is the complete successor-in-interest to the actual offeror, Raytheon Company, and embraces the identical business unit which submitted Raytheon Company's bid in the C–5 AMP procurement. As such, L–3 stands in the shoes of Raytheon Company in the instant case and has standing to pursue this claim."); see also Alabama Aircraft Indus., Inc.-Birmingham v. United States, 83 Fed. Cl. 666, 682 (2008) (successor-in-interest to the original offeror, was the de facto same legal entity which had submitted its proposal), rev'd on other grounds, 586 F.3d 1372 (Fed. Cir. 2009).

Therefore, the court must determine if Universal is the complete successor-in-interest to ABM Security Services, and, moreover, if Universal can offer an identical proposal and all of the assets and services promised in the proposal by ABM Security Services. As the court must compare not only ABM Security Services at the time of sale to Universal, but also if ABM Security Services relied on its corporate parent to qualify for award and to provide services if selected for contract award, this inquiry is a very fact-specific one.

The court first looks to ABM Security Services' proposal. As noted by defendant, the Supplier Capability portion of the proposal listed "Fast Facts," which refer to ABM Industries, ABM Security Services' parent company, and not ABM Security Services.  The "Fast Facts" submitted by ABM Security Services in its proposal state:

| Item | Data Point |
| --- | --- |
| Founded | 1909 in San Francisco, CA |
| Annual Revenue | $4.8 Billion |
| Customers | 20,000+ |
| Employees | 110,000+ |
| Ownership | Publicly traded (NYSE: ABM) |
| Offices | 350+ U.S. & International locations |
| Janitorial Services | 2 Billion square feet cleaned each day |
| Energy Services | $18 Million+ savings from energy reductions |
| Security Services | 12,000+ licensed security personnel |
| | 1,000+ customers |
| | Unarmed & armed security guard services |
| | K-9 services |
| | Mail screening |
| | Command Center staffing |
| | Security officers Armed & Unarmed |
| | Access control monitoring |

|                          |                                                        |
|--------------------------|--------------------------------------------------------|
|                          | Background investigations                              |
|                          | Crowd control                                          |
|                          | Fire watch coverage                                    |
|                          | Life safety monitoring                                 |
|                          | Mobil & Bike Patrol services                           |
|                          | Security consulting and surveys                        |
|                          | Special event coverage                                 |
|                          | EMT & Paramedic Services                               |
|                          | Fire Fighter Services                                  |
|                          | Alarm & Command Center Monitoring                      |
|                          | Public Venues Ushers and Ticket Takers                 |
| **Electrical & Lighting** | 40,000+ parking lot poles & lights maintained         |
| **Facilities Engineering** | 4,000+ certified engineers                           |
| **Parking & Transportation** | $1.5 Billion collected for customers in parking revenue |
| **Landscape & Grounds** | 25,000+ acres of landscaping & golf courses maintained |

(emphasis in original). In addition, above the "Fast Facts," for the Supplier Capability portion of the technical proposal, ABM Security Services' proposal stated that: "ABM will continue to leverage our entire network of corporate resources, third-party subject matter experts and intellectual capital to best serve the Postal Service's needs and expectations," without differentiating between ABM Security Services and its parent, ABM Industries. (emphasis added). Intervenor claims that "[t]his expression of ABM's reliance on ABM Industries Inc. is more specifically and starkly demonstrated in portions of ABM's proposal relating to 'Supplier Capability,'" citing to the statement above that "ABM will continue to leverage our entire network of corporate resources . . . to best serve the Postal Service's needs and expectations." (omission in original). Protestor, however, dismisses this argument, noting that the

> "Fast Facts" section states that ABM corporate family has over 110,000 employees, but surely no one would reasonably conclude that ABM was promising that 110,000 employees would work on the contract. The table also says that the janitorial section of ABM's corporate family cleans over two billion square feet per day and the landscaping and grounds section maintains over 25,000 acres, but USPS cannot with a straight face claim that it thought by this statement that ABM was promising to provide janitors or ground maintenance crews to perform this security guard services contract. Rather, these statements are naturally read to indicate only that ABM is the subsidiary in a larger corporation and that it has the support of its corporate family.

(internal citation omitted).

Oded Barlev, the then Vice President of National Operations for ABM Security Services,[13] the individual who earlier had contacted the contracting officer regarding the sale to Universal,[14] filed an affidavit in the case before this court, which was attached to protestor's response to the motions to dismiss, in which he stated:

> I am aware that ABM's proposal made a number of references to ABM's parent, ABM Industries Inc., and included the consolidated financial statements of the entire ABM corporate family. None of these references were intended to, nor did they, commit to contract performance the assets of the ABM parent companies, ABM Onsite Services, Inc. and ABM Industries Inc., or any of its affiliates. Rather, ABM's proposal clearly committed only the resources of ABM itself to contract performance.
>
> . . .
>
> The purpose of these references was to indicate and explain that ABM was part of a larger company and had the support of that company. I think this is clear from the context of those statements, which included a lot of information that did not directly bear on performance of the USPS contract, or any security guard/NLECC contract for that matter. For instance, I included information about the ABM corporate family's work in golf course and other grounds maintenance, its engineering arm, and its janitorial work to demonstrate its breadth as a company, not because I expected USPS to order these services under the contract.

Despite Universal's and Mr. Barlev's attempt to minimize the references to entities other than ABM Security Services in its proposal, Mr. Barlev concedes that the proposal includes references to ABM Security Services' parent, ABM Industries. Those references and the strengths of ABM Industries would have been read, considered, and evaluated by the agency in determining ABM Security Services' technical rating, as well as in the trade-off analysis.

For example, defendant suggests that in "response to the requirement that an offeror demonstrate adequate financial resources to perform the work," ABM Security Services provided consolidated financial statements of its parent company, as well as Dunn & Bradstreet reports. Defendant notes:

---

[13] In his affidavit submitted with protestor's response to the motions to dismiss, Mr. Barlev indicates that before he was the Vice President of National Operations for Universal, he was the Vice President of National Operations for ABM Security Services.

[14] As noted above, Mr. Barlev indicated: "With regard to ABM's September 30, 2014 offer, we hereby confirm that the offer, along with all of ABM's assets, has been legally transferred to Universal. The offer, now owned by Universal, continues to rely on the same assets – including facilities, resources, and personnel – as originally proposed by ABM."

On October 17, 2014, the Postal Service sent ABM a request for clarification, asking for ABM to explain an unfavorable Equifax credit report and to provide additional assurances regarding its financial capabilities. ABM responded on October 20, 2014, dismissing the Equifax report as "a small local report, which does not reflect ABM's financial and risk profile correctly." ABM's response also stated that it was attaching "copies of a full Dunn & Bradstreet report for ABM as supplied on this date along with a letter of reference from Bank of America to support our credit worthiness and low risk ratings." The "full Dunn & Bradstreet report of ABM" that ABM's response provided was for "ABM Industries Inc." Similarly, the letter from Bank of America discusses the financial strength of ABM Industries.

(internal citations omitted). Defendant also points out that ABM Security Services' response to the requirement that the offeror demonstrate a "'record of integrity and business ethics,' emphasized that fact that its parent company, ABM Industries, is a publically-traded company 'and thus held to a higher standard of ethics and compliance compared with any other competitor.'"

Protestor responds that:

USPS and CSC cite a number of references to ABM's corporate parent and affiliates in the proposal, ABM's submission of consolidated financial statements, and the LinkedIn profiles of some key employees indicating they still work at ABM. However, the proposal statements simply indicate that ABM had the support of its parent and affiliates, and the consolidated financial statements were required by the Solicitation itself. None of this indicates that ABM committed or would employ the assets or resources of those entities in contract performance.

Regarding the consolidated financial statements and credit reports, protestor also argues that defendant and intervenor's arguments ignore "the fact that USPS **required** the information regarding ABM's parent and affiliates. Specifically, the Solicitation required offerors to submit certified and audited financial statements prepared in accordance with generally accepted accounting principles," and claims that "[g]enerally accepted accounting principles require that the financial statements of a wholly-owned subsidiary be consolidated with its parent and affiliates under common control." (emphasis in original). Protestor also claims that "ABM's submission of consolidated financial statements and a statement that ABM Industries, Inc. had not declared bankruptcy was simply an effort to be responsive to the USPS requests, not an indication that ABM was committing its parent's or affiliates' financial resources." Mr. Barlev's affidavit similarly indicates:

I included the consolidated financial statements in the proposal because the Solicitation required certified and audited financial statements prepared in accordance with generally accepted accounting principles. As I understand it, generally accepted accounting principles require a subsidiary company

like ABM to consolidate its financial statements with the other companies that are under common control. Because of this requirement, ABM did not prepare separate audited financial statements as only consolidated statements are prepared and reported. For a similar reason, I submitted consolidated Dunn & Bradstreet and credit reports.

Notably, protestor does not deny that information which was submitted as part of the proposal reflected the parent's information or suggest that the agency would not have considered it in its evaluation. Moreover, although protestor emphasizes "that USPS ***required*** the information regarding ABM's parent and affiliates," it appears that ABM Security Services voluntarily chose to submit the financial information that it did. (emphasis in original). Indeed, as defendant correctly points out, "ABM Security Service's status as a wholly-owned subsidiary did not prevent it from providing its own certified financial records that were GAAP compliant - ABM simply chose not to do so." As defendant's states:

> There simply is no reason why ABM could not have provided the income statements, balance sheets, and statements of cash flow for ABM Security Services Inc. in its proposal, except that it wanted to make its proposal more attractive to the Postal Service by incorporating the assets of ABM Industries, Inc. - which, as ABM's proposal repeatedly emphasized, was worth over $4 billion.

Defendant also states, "nothing prevented ABM from providing its own certified financial statements in addition to the consolidated financials of its parent. In fact, Universal's contention is belied by the Asset Purchase Agreement attached to Universal's opposition brief filed in this court, which includes ABM Security Services, Inc.'s unaudited financial statements (as opposed to those of its parent)." Defendant indicates that the Asset Purchase Agreement represents that the financial Information "attached to the purchase agreement's disclosures includes ABM Security Service [sic] Inc.'s profit and loss statements, balance sheets, and statements of cash flows," and quotes the Asset Purchase Agreement at Section 2.01 which states: "Financial Information was derived from the books and records of the Seller Group and was prepared in accordance with the Accounting Principles in good faith." The court notes that the Annex to Section 2.01 provides a chart of the "Profit and Loss Statement as of FY2013, FY2014 and 9-months ended, July 31, 2015." It appears that ABM Security Services had the ability to provide its own financial information to the agency during the procurement process if it had been so inclined. It appears that even Mr. Barlev indicates how dependent on the parent company ABM Security Services was by noting that ABM Security Services consolidated "its financial statements with the other companies that are under common control."

Furthermore, defendant and intervenor emphasize that although ABM Security Services' proposal identified seventeen people as key personnel in the Guard Services proposal for the Management and Staffing Plan, "at least six of these individuals self-identify as employees of ABM Industries, Inc. or ABM Onsite Services, not ABM Security or Universal," and that "[redacted], who was listed in ABM's proposal as the 'Program

Development Director' under key personnel, appears to no longer be employed by ABM or Universal Protection Services, [sic] LP." As noted by the intervenor, "it appears that ABM's proposed Management and Staffing Plan for Guard Services relied on a significant number of 'Key Personnel' that are not currently employees of ABM Security Services, Inc. or Universal." Mr. Barlev's affidavit tries to explain:

> ABM and Universal are in the process of transferring employees from ABM to Universal. This includes the key personnel included in ABM's proposal. Because of the number of employees and other assets involved in the sale, these transfers do not and cannot happen immediately on the day the sale closes. Indeed, I have just completed the transition process myself. [redacted] has transferred and [redacted] will transfer at a later date to Universal, although [redacted's] status remains uncertain . . . [redacted], [redacted], and [redacted] left employment with ABM after ABM submitted its proposal in September 2014. I understand that [redacted] is leaving ABM tomorrow [2/12/16]. [redacted] moved to a different position in ABM Onsite, Inc. before the sale. It would be quite unusual if none of ABM's employees had moved on in their careers during this significant passage of time. That's the normal pattern of business. Universal has replaced these employees in their capacities as key personnel for the USPS Solicitation.

Protestor's response argues that defendant's and intervenor's

> evidence consists solely of outdated and incorrect LinkedIn profiles. As this Court may suspect, a LinkedIn profile pulled off the internet is not a particularly reliable source of current employment information, particularly during a time of a corporate transition. In fact, each of the seven employees identified by Defendant and CSC is either transitioning to Universal or has left ABM since the time of proposal submission nearly one and half years ago.

The determination of whether the ABM Security Services proposal remains intact and even can be executed by Universal as a successor-in-interest to ABM Security Services' proposal, and, therefore, whether Universal is a complete successor-in-interest to ABM Security Services on the submitted proposal, includes whether the departures and now unavailable resources of the parent company will impact Universal's ability to succeed. Protestor argues that:

> The Court of Federal Claims' decision in *Alabama Aircraft* provides the proper legal framework for this issue. *Ala. Aircraft Indus.*, 83 Fed. Cl. 666. Like Defendant here, the agency in that case argued that the offeror had relied on the workforce, capabilities, facilities and resources of its parent in its proposal, and those resources were no longer available following a corporate reorganization and sale of corporate assets. *Id.* at 682. The agency also contended that the protester, as a result of the sale of corporate assets, did not have the financial ability to perform the contract. The Court

rejected both of these contentions. First, the Court noted that while the proposal contained a number of references to the offeror's parent company, those references "connoted only that [the offeror] had the financial support of its parent."

(citing <u>Alabama Aircraft Indus., Inc.-Birmingham v. United States</u>, 83 Fed. Cl. at 682). Indeed protestor, defendant,[15] and intervenor all cite to the Federal Claims decision in <u>Alabama Aircraft Industries, Inc.-Birmingham v. United States</u>, 83 Fed. Cl. 666, with defendant arguing that:

> Here, unlike in *Alabama Aircraft*, ABM Security Services Inc. did "rely upon the availability of resources from [ABM Industries, Inc.] in formulating its proposal." *Id.* at 683. Further, as we explain in greater detail below, unlike in *Alabama Aircraft*, the sale of ABM Security Services Inc. to Universal does affect assets that are necessary to contract performance or that were "necessary to [ABM Security Services'] proposed approach."

(citing <u>Alabama Aircraft Indus., Inc.-Birmingham v. United States</u>, 83 Fed. Cl. at 683).

In <u>Alabama Aircraft</u>, the Court of Federal Claims noted that "[t]he Air Force and Boeing claim that Alabama Aircraft fails to qualify as an 'interested party' because 'it is not the same entity that submitted a proposal' and because it lacks adequate financial resources to perform the KC–135 contract." <u>Id.</u> at 681. The protestor in <u>Alabama Aircraft</u> argued "that it is the same corporate entity as Pemco Aeroplex, that the Air Force had notice of the sale of Pemco World Air and the resulting name change, and that it has the financial capability to perform the contract, as evidenced by an audit report prepared in June 2008 by the Defense Contract Audit Agency." <u>Id.</u> The <u>Alabama Aircraft</u> court noted that intervenor Boeing's motion to dismiss did not explain how the assets sold by "Alabama Aircraft's parent corporation were necessary for Alabama Aircraft to perform the contract or that the assets were 'necessary to its proposed approach.' The sale of Pemco World Air did not affect the physical resources on which Alabama Aircraft would rely in performing the KC–135 PDM contract." <u>Id.</u> (internal citation omitted). The <u>Alabama Aircraft</u> court further determined that:

---

[15] The court notes that, although defendant also cites to <u>Emerald Coast Finest Produce Co. v. United States</u>, 79 Fed. Cl. 466 (2007), the facts of that case are very different from the above captioned protest, as the protestor in <u>Emerald Coast</u> admitted that "Emerald Coast can no longer compete for a successor contract issued by DeCA [Defense Commissary Agency of the Department of Defense, Resale Contracting Division]. . . ." <u>Id.</u> at 471. Protestor in <u>Emerald Coast</u> was seeking recovery of its proposal costs and an award of its costs and attorney fees. The <u>Emerald Coast</u> court concluded, "[b]ecause plaintiff had standing when it filed this bid protest, the court finds that, regardless of whether plaintiff can perform the contract at this time, plaintiff does indeed have standing to continue its bid protest." <u>Id.</u>

The sale of the Pemco World Air subsidiary did not affect the operational resources that Alabama Aircraft could devote to the KC–135 PDM contract. Prior to the sale, Alabama Aircraft did not rely on either the personnel or the assets of Pemco World Air to perform its work. Consistent with the separate existence of Pemco World Air and Alabama Aircraft, Pemco World Air had no involvement with the current KC–135 bridge contract. The sale of Pemco World Air did not affect any of the facilities, equipment, or personnel that were necessary to perform the work contemplated by Alabama Aircraft's proposal.

Id. at 682 (internal citations omitted). The Alabama Aircraft court concluded:

Alabama Aircraft has standing to challenge the Air Force's award of the KC–135 PDM contract because it satisfies the definition of "interested party." Despite its name change and the sale of a sister subsidiary, Alabama Aircraft is the same legal entity as the company that submitted its second final proposal revision in June 2007. Alabama Aircraft has the same operational capabilities as its predecessor and due to the sale to the sister company it is in a stronger financial position to perform the instant contract. Furthermore, the Air Force had ample notice of the sale of the sister company and failed to initiate any inquiries about whether the sale called into question Alabama Aircraft's capabilities to perform the contract."

Id. at 685.

This court believes that Alabama Aircraft supports defendant's and intervenor's position. Unlike the conclusion in Alabama Aircraft, that, "Alabama Aircraft has the same operational capabilities as its predecessor and due to the sale to the sister company it is in a stronger financial position to perform the instant contract," this court believes Universal is not the same position now as ABM Security Services was when it submitted its proposal. In fact, Universal appears to lack all of the resources ABM Security Services articulated when it referenced its parent and related corporations.[16] ABM Security Services repeatedly used, and relied on, the name and financial information of its parent company in its proposal. Each instance was designed to bolster the proposal of ABM Security Services, and was not, as Mr. Barlev's affidavit would like the court to believe, mere information about "ABM corporate family's work in golf course" and "grounds maintenance." Protestor would have this court believe that each reference was only coloration and not relevant to the merits of the evaluation. The court disagrees, and concludes that, there are simply too many references to support from, or reliance on, the parent company, ABM Industries. Moreover, the information supplied by Mr. Barlev in his affidavit, including about available personnel, although intended to bolster protestor's

---

[16] At oral argument, protestor claimed: "At this point, Universal is 80,000 employees, a $2.5 billion company.  It's huge.  The biggest or one of the biggest security firms out there."

case, in fact, does the opposite. The court believes that, unlike in <u>Alabama Aircraft</u>, in which the court found the references to the parent company "connoted only that [the offeror] had the financial support of its parent," <u>id.</u> at 682, ABM Security Services' references to its parent company promised more, including personnel and back up support, which Universal has not demonstrated it can provide after the sale of ABM Security Services by ABM Industries.

Additionally, although protestor also cites to the case <u>L-3 Communications Integrated Systems, L.P. v. United States</u>, 84 Fed. Cl. 768, as an example of an agency wrongly arguing that a protestor did not have standing as a successor in interest, <u>L-3</u> does not assist the protestor. The <u>L-3</u> court indicated:

> Defendant contends that L–3 fails to qualify as an interested party because it was not an actual or prospective offeror and did not submit a proposal— indeed it did not even exist when its predecessor submitted its offer. While this is true, this argument ignores the reality that L–3 is the complete successor-in-interest to the actual offeror, Raytheon Company, and embraces the identical business unit which submitted Raytheon Company's bid in the C–5 AMP procurement. As such, L–3 stands in the shoes of Raytheon Company in the instant case and has standing to pursue this claim.

<u>Id.</u> at 779.  As demonstrated above, this court does not believe that even if Universal is a complete successor-in-interest to ABM Security Services, the specific references to ABM Industries in the proposal submitted by ABM Security Services necessarily means that Universal cannot with any certainty fulfill the promises made in the proposal submitted by the agency.[17]

Defendant also alleges that ABM Security Services' proposal relied upon not only the personnel, but also the assets of ABM Industries that were not purchased by or transitioned to Universal.  Defendant specifically points to the fact that

> [i]n its proposal, ABM relied heavily upon "[ABM Security Services' license]," a proprietary third-party web-based data collection and analytics system.

---

[17] The court notes that defendant cites to <u>American Government Properties v. United States</u>, 118 Fed. Cl. 61 (2014) and claims the holding of that case was a "finding parent was not successor-in-interest to subsidiary's interest in contract with Government in-part because parent did not maintain same management or had 'same financial wherewithal to perform the contract.'" (quoting <u>Am. Gov't Properties v. United States</u>, 118 Fed. Cl. at 68). That case, however, and was not a protest situation, but an alleged breach of contract regarding the termination of a contract. Moreover, the successor-in-interest issue in <u>American Government</u> stemmed not from a contract clause, as in the above captioned protest, but from a statute, 41 U.S.C. § 6305 (2012), known as the Contracts Act, which prohibits the transfer of federal contracts, or any interest in such a contract, to another party.  <u>See</u> <u>Am. Gov't Properties v. United States</u>, 118 Fed. Cl. at 66.

Indeed, ABM specifically proposed integrating [ABM Security Services' license] into the Postal Service contract:  ABM develops and deploys proprietary and best-in-class outsourced technology systems to manage service performance and cost. We provide web-based secure access to extensive amounts of data for tracking service performance including contact information, scope of work levels, service compliance to schedules, quality levels, staffing activities, service calls, and financial status. The following technology components are being used, and/or proposed for use to the national USPS portfolio

• Mobile security management via laptops & smartphones — **[ABM Security Services' license]**
• Labor Management System for Scheduling & Payroll— [redacted]
• Online Performance Metrics — [redacted]
• USPS dedicated ABM web portal — [redacted]
• Training Technology — [redacted]
• Collaborative Web Service for Continuous Improvement — [redacted]
• Security guard alerts viewed at NLECC — **[ABM Security Services' license]**
• Best-Practices Sharing in Online Community — [redacted]
• Infrastructure Technology Platform – [redacted]

(emphasis added by defendant). As defendant correctly points out, "[h]owever, the Disclosure Schedules attached to the Asset Purchase Agreement lists [ABM Security Services' license] as an excluded asset: 'The License / Partnership Agreement for subscription with [redacted] for security software solutions, dated November 12, 2014, between ABM Security Services, Inc. and [ABM Security Services' license] will not be Conveyed to Buyer.'"[18] At oral argument, protestor addressed the excluded assets for the first time and contended that the [ABM Security Services' license] software was not material to the sale or to the court's inquiry of whether Universal is the complete successor-in-interest to ABM Security Services, and, therefore, it did not matter that the [ABM Security Services' license] and other licenses were carved out of the transfer, because the licenses were "commercially available licenses. Universal Protection can simply go to [ABM Security Services' license] and buy it. It's as simple as that." Protestor also emphasized that the [ABM Security Services' license] is "a commercially available

---

[18] Defendant also notes that "other information technology assets included in ABM's proposal were excluded from the assets transferred to Universal.  Annex 2.10 to the Asset Purchase Agreement provides that the following "Core applications" that are committed to contract performance in ABM's proposal will not be transferred to Universal: [redacted]; [redacted]; and [redacted]." (internal citations omitted). Therefore, defendant argues, "significant portions of the information technology assets included in ABM's proposal were resources of ABM Industries, Inc. — and were not acquired by Universal."

piece of software that also was available in a similar form at Universal."[19] Despite the claims made by protestor at oral argument, it is indisputable that the [ABM Security Services' license], which was a part of ABM Security Services when it submitted its proposal, was not part of Universal's assets when it filed the protest in this court. Moreover, although protestor claims that Universal likely had similar commercially licensed software or could obtain it from [redacted], the court cannot only rely on protestor's projections, and there is no evidence of protestor's contentions in the record or in the submissions to the court regarding the motions to dismiss. Therefore, as alleged by defendant, "because Universal is not the complete successor-in-interest to ABM Security Services, Universal cannot demonstrate that the Postal Service's award of the contract to CSC prejudiced it." Protestor cannot demonstrate that it can meet the "substantial chance" test to be awarded the contract, and, therefore, lacks standing in this court. See Todd Constr., L.P. v. United States, 656 F.3d at 1315.

## CONCLUSION

The court notes that the sale of ABM Security Services did not occur until after the agency agreed to take corrective action, and the corrective action appears to have changed little of the underlying evaluation and award justification. Had the agency not taken the corrective action and had the court evaluated the merits of the claims earlier, defendant and intervenor could not have alleged lack of standing due to the sale to Universal because it would not yet have occurred. Despite the unfortunate procedural history of this protest, and the previous, related protests, and the difficult situation in which protestor Universal finds itself, the court concludes that Universal is not the complete successor-in-interest to ABM Security Services' proposal, and, therefore, the court cannot consider the merits of the protest. Based on the above discussion, defendant's and intervenor's motions to dismiss protestor's complaint are **GRANTED.** The parties' cross-motions for judgment on the Administrative Record are **MOOT**. Protestor's complaint is **DISMISSED**. The Clerk's Office shall enter **JUDGMENT** consistent with this opinion.

IT IS SO ORDERED.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[19] Protestor also argued at oral argument that "the [ABM Security Services' license] software is not mentioned anywhere in the evaluation. It's not something pivotal to the Government's view of the proposal."